159 F.3d 1178
 159 L.R.R.M. (BNA) 2588, 22 Employee Benefits
Cas. 2050,
98 Cal. Daily Op. Serv. 7954,
98 Daily Journal D.A.R. 11,039,
Pens. Plan Guide (CCH) P 23949D
 ASSOCIATED GENERAL CONTRACTORS OF AMERICA, San Diego
Chapter, Inc., a nonprofit corporation, Plaintiff-Appellant,
v.
METROPOLITAN WATER DISTRICT OF SOUTHERN CALIFORNIA, a public
corporation, Defendant-Appellee.
ASSOCIATED GENERAL CONTRACTORS OF AMERICA, San Diego
Chapter, Inc., a nonprofit corporation, Plaintiff-Appellant,
v.
METROPOLITAN WATER DISTRICT OF SOUTHERN CALIFORNIA, a public
corporation, Defendant-Appellee.
 Nos. 98-55630, 98-56408.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Oct. 7, 1998.
Decided Oct. 23, 1998.
 
 David P. Wolds, Merrill, Schultz & Wolds, San Diego, California, for plaintiff-appellant.
 Andrew C. Peterson, Morgan, Lewis & Bockius, Los Angeles, California, for defendant-appellee.
 John H. Widman, McAleese, McGoldrick & Susanin, King of Prussia, Pennsylvania, for amicus, Associated General Contractors of America, Inc.
 Christine Williams, Feder & Associates, Washington, D.C., for amicus, National Coordinating Committee For Multiemployer Plans.
 Appeals from the United States District Court for the Southern District of California; Jeffrey T. Miller, District Judge, Presiding. D.C. No. CV 98-00416-(JTM)LSP.
 Before: BRUNETTI, FERNANDEZ, and McKEOWN, Circuit Judges.
 FERNANDEZ, Circuit Judge:
 
 
 1
 Associated General Contractors of America, San Diego Chapter, Inc., brought this action against the Metropolitan Water District of Southern California for the purpose of preventing MWD from enforcing a project labor agreement (PLA) regarding MWD's Eastside Reservoir Project and a similar PLA regarding MWD's Inland Feeder Project. AGC argued that the PLAs were preempted by ERISA[1] and moved for a preliminary injunction. When that motion was denied, AGC appealed. Thereafter, the district court dismissed the action with prejudice, and AGC also appealed that dismissal. We affirm.
 
 BACKGROUND
 
 2
 AGC is a trade association whose members include both general contractors and subcontractors. It exists to foster, protect and promote the common interests of its members. Its executive vice president declared that in pursuit of those goals it, among other things, "supports fair and nondiscriminatory competitive bidding practices for both public and private construction projects. AGC also is heavily involved with local, state and federal public works agencies to establish and maintain fair and nondiscriminatory competitive bidding practices." In addition, it sponsors a retirement plan, a health and welfare plan, and an apprenticeship training program for use on both private projects, and state and federal public works projects. It makes those plans available to its qualified general contractor and subcontractor members. The AGC apprenticeship plan has been approved by the California Apprenticeship Counsel to train apprentices in various work classifications on public works projects in a number of counties in southern California.
 
 
 3
 MWD is a public corporation organized and existing under the laws of the state of California. It is a regional water agency, which imports water from northern California and the Colorado River into the coastal plain of southern California. MWD is authorized to prescribe "methods for construction of work and for the letting of contracts for the construction of works." Cal. Pub. Cont.Code § 21564. Contracts that exceed $25,000 must be awarded to the lowest responsible bidder after advance publication of notices inviting bids. See Cal. Pub. Cont.Code § 21565.
 
 
 4
 MWD determined that it would construct the Eastside Reservoir Project, which will expand water storage capacity for the area it serves. The cost of that project will be in the neighborhood of two billion dollars. It will, obviously, require large numbers of companies and laborers to bring it to completion. MWD also decided to construct the Inland Feeder Project, which is a water distribution pipeline that will cost about one billion dollars. In an attempt to assure a good measure of labor harmony, MWD pursued the negotiation of the PLAs with a number of unions. The terms were hammered out, and were then adopted and approved by the MWD board of directors. They are, therefore, what amount to collective bargaining agreements which are specific to the projects for which they were negotiated. When the projects end, the PLAs will expire.
 
 
 5
 Of course, the PLAs would not have much efficacy if they did not bind the contractors and subcontractors who work on the projects. Thus, the bid specifications for the projects require all contractors and subcontractors to agree to the terms of the PLAs. The provisions challenged by AGC require direct participation in certain designated employee benefit funds. In addition, general contractors and subcontractors working on these projects must obtain and train apprentices through established apprenticeship programs specified in the PLAs.
 
 
 6
 AGC filed this complaint against MWD for the purpose of obtaining declaratory relief and for the purpose of enjoining MWD from enforcing the provisions of the PLAs that require participation in the benefit plans. AGC filed a motion for a preliminary injunction, which requested that MWD be enjoined from requiring adoption of the PLAs as conditions to awarding contracts to perform work on the two projects, or any other public works project, until the employee benefit plan provisions were removed from them.
 
 
 7
 The district court concluded that AGC had standing, but that it had wholly failed to show a likelihood that it would prevail on its claim that the PLAs violated ERISA. It, therefore, denied the preliminary injunction. In addition, the district court dismissed AGC's complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It granted leave to amend, but then dismissed the amended complaint on the same ground. That dismissal was with prejudice. These appeals followed.
 
 STANDARDS OF REVIEW
 
 8
 We review the district court's determination that AGC has standing de novo. See Inland Empire Chapter of Associated Gen. Contractors v. Dear, 77 F.3d 296, 299 (9th Cir.1996). We also review its determination regarding ERISA preemption de novo. See Aloha Airlines, Inc. v. Ahue, 12 F.3d 1498, 1500 (9th Cir.1993). Moreover, we review its determination that the preliminary injunction should be denied because AGC had no likelihood of success on the merits de novo. See Inland Empire Public Lands Council v. Schultz, 992 F.2d 977, 980 (9th Cir.1993). At the same time, our review of denials of injunctive relief is limited, and we will reverse only if the district court "abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact." Herrington v. County of Sonoma, 12 F.3d 901, 907-08 (9th Cir.1993).
 
 
 9
 In addition,
 
 
 10
 We review a dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) de novo. We limit our review to the allegations of material facts set forth in the complaint, which we read in the light most favorable to the non-moving party and which, together with all reasonable inferences therefrom, we take to be true. However, conclusory allegations of law and unwarranted inferences are not sufficient to defeat a motion to dismiss.
 
 
 11
 Pareto v. FDIC, 139 F.3d 696, 699 (9th Cir.1998) (citations omitted).
 
 JURISDICTION
 
 12
 MWD first argues that there is no jurisdiction to proceed because AGC does not have standing to bring this action. We disagree. The test for representational standing, which is what AGC seeks, is:
 
 
 13
 (a) its members would otherwise have standing to sue in their own right;
 
 
 14
 (b) the interests it seeks to protect are germane to the organization's purpose; and
 
 
 15
 (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.
 
 
 16
 Associated Gen. Contractors v. Coalition for Econ. Equity, 950 F.2d 1401, 1406 (9th Cir.1991) (citation and internal quotations omitted).
 
 
 17
 There can be no doubt that AGC meets the second of these tests. Certainly its desire to remove restrictions which, as it sees it, will interfere with favorable bidding conditions sought by its members is germane, even central, to its purposes. See id. Similarly, there can be little doubt that the claims raised by AGC do not require the participation of individual members in this action. Individualized proof from the members is not needed where, as here, declaratory and injunctive relief is sought rather than monetary damages. See id. at 1408; cf. Inter-Modal Rail Employees Ass'n v. Atchison, Topeka and Santa Fe R.R. Co., 80 F.3d 348, 350 (9th Cir.1996), judgment vacated on other grounds, 520 U.S. 510, ----, 117 S.Ct. 1513, 1517, 137 L.Ed.2d 763 (1997). That leaves only the first part of the test: would the members themselves have standing? We are satisfied that they would.
 
 
 18
 This is not a case where there is a claim that some member might hypothetically be affected some day, but "without any description of concrete plans" or "any specification of when the some day will be." Lujan v. Defenders of Wildlife, 504 U.S. 555, 564, 112 S.Ct. 2130, 2138, 119 L.Ed.2d 351 (1992). Here AGC pointed out that its members regularly bid on public projects and are being deterred from bidding on these projects because of the PLAs alone. The member declarations that AGC presented were from officers of companies which, as the declarants swore, supply materials and labor to public works projects on a regular basis. One of the companies actually did perform work on the projects in question and was forced to follow the terms of the PLAs. The other company would bid to work on the projects were it not prevented from doing so because the PLAs would require it to participate in ERISA plans other than the ones that it already supplies to its employees. It is clear that these members have been and will be directly affected by the PLAs. There is not much speculation about that. See Coalition For Econ. Equity, 950 F.2d at 1407. Nor is it significant that these companies, which would like to bid, may not actually be selected. They are able and ready to bid and the PLAs prevent them from, or penalize them for, doing so. See Northeastern Fla. Chapter of Associated Gen. Contractors v. City of Jacksonville, 508 U.S. 656, 666, 113 S.Ct. 2297, 2303, 124 L.Ed.2d 586 (1993).
 
 
 19
 AGC has standing to bring this action, the district court had jurisdiction pursuant to 28 U.S.C. § 1331, and we have jurisdiction pursuant to 28 U.S.C. § 1292. Thus, AGC has won this part of the agon.DISCUSSION
 
 
 20
 While AGC has won the standing battle, its victory is fugacious because it must lose the preemption war. Its claim of preemption depends upon the language of 29 U.S.C. § 1144(a), which provides, in pertinent part, that: "The provisions of [ERISA] shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan...." That directive seems simple enough on its face, but it is only so to one who knows what is meant by "State laws." The content of that phrase decides this case. We are not entirely without guidance in that respect because Congress has provided some definitions. As 29 U.S.C. § 1144(c) states:
 
 For purposes of this section:
 
 21
 (1) The term "State law" includes all laws, decisions, rules, regulations, or other State action having the effect of law, of any State....
 
 
 22
 (2) The term "State" includes a State, any political subdivisions thereof, or any agency or instrumentality of either, which purports to regulate, directly or indirectly, the terms and conditions of employee benefit plans covered by this subchapter.
 
 
 23
 These definitions do help, but we must first address a minor difficulty. The parties, in effect, agree that MWD is a State within the meaning of the definitions. What they basically argue about is whether the PLAs amount to rules, regulations, or actions which have the effect of law. But an entity cannot be a State unless it purports to regulate the terms or conditions of an employee benefit plan. Thus, the PLAs are not State law unless they are rules, regulations or actions which have the effect of law of a State, but MWD cannot be a State unless it purports to regulate an ERISA plan. Rather than attempt to solve any conundrum presented by the relatedness of these provisions, we will assume that MWD is a State for ERISA purposes in the sense, but only in the sense, that it is a political subdivision, an agency, or an instrumentality of the State of California, even though it is not the State of California itself. We will not assume that it purports to regulate an ERISA plan.
 
 
 24
 That leaves other questions for consideration. The question to which we will address ourselves is whether the PLAs constitute State law in the sense that they are "rules, regulations, or other ... action having the effect of law," as they must be if they are to be considered State law for ERISA purposes. 29 U.S.C. § 1144(c)(1). It is apparent that they are nothing of the kind; they are mere negotiated contract provisions demanded for certain projects. In Minnesota Chapter of Associated Builders & Contractors, Inc. v. County of St. Louis, 825 F.Supp. 238 (D.Minn.1993), the district court persuasively explained the difference. There the county had adopted a PLA for a jail building project, and the contractors' association objected on the ground that the PLA was preempted by ERISA. The district court cogently stated that:
 
 
 25
 ERISA preempts "any and all state laws so far as they may now or hereafter relate to any employee benefit plan." State laws include "all laws, decisions, rules, regulations, or other State action having the effect of law, of any state." The definition of state laws excludes state action which does not have the effect of law, and ERISA therefore does not preempt state action which relates to an ERISA plan so long as the state action does not have the effect of law. This distinction indicates that where the state merely acts as any private party might act, instead of in areas where it exercises lawmaking or law enforcement authority, ERISA preemption does not come into play.
 
 
 26
 The bid specification applies to a discrete project. It is not a generally applicable law or regulation. It does not even apply to every project done in the county. Any private party could insist that contractors on a construction project enter into a similar prehire agreement to protect against work stoppages. This proprietary action of the county does not appear to be a "state law" within the meaning of 29 U.S.C. § 1144(c)(1), and therefore plaintiffs likelihood of prevailing on the preemption argument ... is not good.
 
 
 27
 Id. at 243. (Citations omitted). The court continued:
 
 
 28
 ERISA does not provide any express or implied indication that a state may not act as a private party would be permitted to with respect to its property. To the contrary, ERISA's definition of state law preserves this distinction by only including state action that has the effect of law.
 
 
 29
 Id.
 
 
 30
 In so doing, the district court drew upon and hearkened to the distinction between an entity, like MWD, which acts much like any private party could, and an entity which acts in a more general regulatory capacity. That is sometimes referred to as the market participant/regulator distinction, a concept which has been expatiated on by the Supreme Court in the labor relations area. See Building & Constr. Trades Council v. Associated Builders & Contractors, 507 U.S. 218, 113 S.Ct. 1190, 122 L.Ed.2d 565 (1993) (Boston Harbor ).
 
 
 31
 In Boston Harbor, the Supreme Court was faced with a situation where a public entity required that all bidders on the Boston harbor clean-up project adhere to a PLA. The contractors association complained because, it said, the National Labor Relations Act preempted states from enacting or enforcing laws which attempted to regulate labor relations. But, said the Court, the PLA in question was not a government regulation at all. See id. at 232, 113 S.Ct. at 1199. Its determination was based upon the distinction between a public entity which acts like a regulator and one which acts like any other participant in the market, and which happens to have the economic power to exact the provisions it desires when it contracts. As the Court said:
 
 
 32
 To the extent that a private purchaser may choose a contractor based upon that contractor's willingness to enter into a prehire agreement, a public entity as purchaser should be permitted to do the same. Confronted with such a purchaser, those contractors who do not normally enter such agreements are faced with a choice. They may alter their usual mode of operation to secure the business opportunity at hand, or seek business from purchasers whose perceived needs do not include a project labor agreement. In the absence of any expressed or implied indication by Congress that a State may not manage its own property when it pursues its purely proprietary interests, and where analogous private conduct would be permitted, this Court will not infer such a restriction.
 
 
 33
 Id. at 231-32, 113 S.Ct. at 1198. That rational distinction applies just as strongly here, for ERISA itself carefully distinguishes between state action in general and state action which has the effect of law. The PLAs in question do reflect the action of MWD, but they do not reflect anything remotely like rules, regulations or laws. They only reflect an owner's desire to contractually assure peace and prosperity on particular projects.[2]
 
 
 34
 We are mindful of AGC's argument that we have already declared a contrary rule in a number of cases. An uncritical legal study would suggest that we have adumbrated a rule antithetical to reasoning like that in Boston Harbor. But we have never, in fact, done so.
 
 
 35
 AGC asks us to consider Hydrostorage, Inc. v. Northern Cal. Boilermakers Local Joint Apprenticeship Comm., 891 F.2d 719 (9th Cir.1989). We have, but we find it inapposite. That case involved the California Apprenticeship Council, which has the power "to issue rules and regulations establishing minimum standards of wages, hours, and working conditions for apprentices." Id. at 721. The Council issued an administrative order against Hydrostorage because it had not complied with the Council's apprenticeship requirements. See id. at 723. We said that "[t]here is no question that the Council's administrative order against Hydrostorage constitutes a 'state law' within the meaning of ERISA." Id. at 729. We had no doubt that "[t]he Council's order has the effect of law in California," or that the Council was a state for ERISA purposes. Id. When it was argued that the Council did not purport to regulate because it merely acted as a market participant, we suggested that the market participant doctrine did not apply beyond the dormant commerce clause area. Id. at 730. We then went on to hold that "California in this case is not acting merely as a 'market participant' rather than a regulator." Id. Of course, the strength of our first comment was seriously undercut by Boston Harbor, but our actual holding that California was not acting as a market participant was the real point. There was no need to give any deep consideration to the market participant concept when we were dealing with a regulator.
 
 
 36
 AGC then asks us to look at Dillingham Constr. N.A., Inc. v. County of Sonoma, 57 F.3d 712 (9th Cir.1995), rev'd on other grounds, 519 U.S. 316, ----, 117 S.Ct. 832, 842, 136 L.Ed.2d 791 (1997). There, again, we dealt with the Council, and its rules and regulations. Id. at 715-16. We alluded to the fact that we were dealing with a state law, and pointed out that the scope of ERISA preemption of state law was different from the scope of NLRA preemption. Id. at 722. But we did not stop with that reflection. Instead, we went on to rely upon our determination in Hydrostorage that "the state was not acting merely as a market participant but that its enforcement of conditions of apprenticeship was aimed at regulating contractors who work on public contracts." Id. Again, the pith of our decision was that we were dealing with a state law which did purport to regulate. As we said, "we conclude that the state's action in enforcing its prevailing wage law in this case goes beyond that of a mere market participant and is preempted by ERISA." Id.
 
 
 37
 MWD has not enacted a law, or issued a decision, or adopted a rule or regulation, or taken any other action which can be said to have the effect of a law of the State. It has merely proposed the terms of contracts, and then entered into those contracts. As MWD's former risk manager and current consultant declared, its concerns are "to ensure labor harmony and avoid disruption during the lengthy period of construction ... and, generally, to increase the potential for on-time, effective, efficient construction." AGC might not think that a PLA is the best way to address those concerns, but it is pellucid that the concerns are the typical ones held by any market participant who is interested in building out a project without incurring unnecessary transaction costs. That is merely proprietary action. See Associated Builders and Contractors, Inc. v. City of Seward, 966 F.2d 492, 496 (9th Cir.1992). The result of MWD's action was in the nature of contract, not in the nature of law. That fact struck to the heart of AGC's argument and supported the district court's decisions to deny the preliminary injunction and to dismiss the action. The district court allowed AGC an opportunity to amend its complaint to repair the damage, if it could. It could not; the blow was obviously fatal. Thus, the district court did not abuse its broad discretion when it refused to grant AGC still further leave to amend. See Allen v. City of Beverly Hills, 911 F.2d 367, 373-74 (9th Cir.1990).
 
 CONCLUSION
 
 38
 AGC, which has representational standing, argues that its members should not have to thole the burdens of the PLAs demanded by MWD when they seek the benefits to be derived from working on the Eastside Reservoir Project and the Inland Feeder Project. Alas, those on a quest must often encounter and bear hardships. The hardship here is simply the unwillingness of MWD to let public works contracts on these projects unless the contractors are willing to abide by the PLAs. In so doing, MWD is clearly acting as a market participant. It has stated the contract terms, and everyone, or anyone, is free to accept or reject those terms.
 
 
 39
 In short, if AGC looks upon a PLA as a manticore, that beast sprang from the demands of a proprietor rather than from the demands of a regulator. The district court did not err.
 
 
 40
 AFFIRMED.
 
 
 
 [1]
 The Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461
 
 
 [2]
 We see no merit in AGC's argument that simply because a contract is legal and enforceable it has the effect of law of a state. No case cited by AGC stands for that proposition. American Airlines, Inc. v. Wolens, 513 U.S. 219, 229 n. 5, 115 S.Ct. 817, 824 n. 5, 130 L.Ed.2d 715 (1995) points out that language like " 'law, rule, regulation ... connotes official government-imposed policies, not the terms of a private contract.' " In fact, the mere existence of a common-law contract remedy does not change a voluntary contract commitment into a state law requirement. Id. at 229, 115 S.Ct. at 824. As we have noted, the contract terms at hand are just like those of a private contract. Nor is Western Radio Services Co., Inc. v. Espy, 79 F.3d 896 (9th Cir.1996) of any aid to AGC's position. It merely sets out a method by which a court can determine whether operating guidelines and procedures in a manual and a handbook used by an administrative agency have the force of law. Id. at 901. In fact, Western Radio instructs that operating guidelines do not have the effect of law unless they are legislative in nature and promulgated pursuant to a specific statutory grant of authority. Id. Chen v. INS, 95 F.3d 801 (9th Cir.1996) is even further afield, for it simply deals with the force and effect of an order promulgated by the president. Id. at 803, 805. Again, we deal here with contracts, not with rules, regulations, agency manuals, agency handbooks, or executive orders